Mr. Mason, when you are prepared, please proceed. Thank you, Your Honor. And may it please the Court. My name is Brock Mason, and I'm the attorney representing the appellant Trenton Johnson in this case. Given that this case— Counselor, could you move the mic a little closer to you? Yes, Your Honor. Is this better? A little bit. Okay. I'll try to speak up. I apologize. There we go. Given that this case was fourth on the Court's docket, I want to briefly address a few facts of this case. On February 26, 2018, Trenton Johnson was employed as a union millwright at Concorp, Inc. He was not an employee of Exide Technologies, the appellee in this case. On this particular day, Mr. Johnson was changing a conveyor belt on a chip conveyor at the Exide facility. In the process of changing this chip conveyor, Mr. Johnson slipped and fell into a vat of molten lead, severely burning his lower legs and lower body. The procedural posture to get here is the appellee filed a motion for summary judgment, which was in turn granted by the District Court, finding that Trenton Johnson was Exide's statutory employee pursuant to the Missouri Statute 287.040. In doing so, the District Court found that he was barred from bringing his personal injury claims against Exide based on the workers' compensation exclusivity provision. The District Court explicitly analyzed two of the three factors that need to be found for someone to be considered a statutory employee as it was uncontroverted that this accident happened at the Exide facility. Those two factors are whether there was an agreement for this work to be done and whether this work, the changing of the chip conveyor belt, was in the usual course of Exide's business. Both are at issue today, and both were determined in error by the District Court. So I want to take those two points and address them in turn. Can I ask you just sort of the standard here, which is, is this a purely legal question that a judge decides whether the exclusivity applies, or is this something that a jury could conceivably decide, whether or not those two statutory elements are met? It's a purely legal question that's based on a factual foundation that must be decided by the jury. And I can cite the court to a few cases that hold when the parties disagree about whether the work was done pursuant to an actual contract, that's a question for the jury to decide. The District Court, in this case, stepped into the shoes of the jury and decided and weighed the controverted evidence and found that there was an implied oral contract for the ongoing preventative maintenance of these machines. What is an implied oral contract? Because I thought that an oral contract is a contract in fact, and an implied contract is something that arises when there is no contract as between the parties, right? And so I'm looking at, I mean, maybe I just don't understand Missouri law, and there's some kind of animal floating around out there that's an implied oral contract, but I just don't know what it is. It seems to me what we have here is that there is an oral contract that is accepted by performance, that there are some indefinite terms, but it is in fact just somebody hires somebody to go out and do work, and they agree to do the work by showing up and doing the work, and that's a contract. It's partially oral within some indefinite terms, and the question at that point becomes, is it sufficiently definite to be a contract? And I would agree, Your Honor. The issue in this case is whether that oral contract that the District Court found covered all general preventative maintenance of the machines that Concorp had originally installed at this Exide facility, and that can only be a question determined by the jury. There's a ton of evidence in this case that the parties didn't contemplate an ongoing contractual relationship for Concorp to continually return to the Exide facility. It might have been a good business decision for Concorp to continually return to the facility, but there is no legal basis for them to have to return to do the work on this equipment. Well, it seems like what there's going on here is there's some kind of informal oral agreement, and there's a shakedown period after the installation of this new line. They're having some difficulties making it work the way that they think that it should, and so people are being called back to tweak it, trying to get it sort of finalized and operating, and whatever that is, that seems like a contract between, you know, Concorp and Exide, right? I would generally agree with you, except for the fact that this particular maintenance of the machine, the change in the conveyor belt, wasn't because the machine wasn't operating correctly or pursuant to the agreement that was originally executed between the two parties, the rigging and installation agreement, is what it was called. Was it a routine maintenance operation that was done on some periodic basis? I don't know if it's necessarily routine, Your Honor. Exide, in its briefing, has conceded that this was done as needed. Routine connotes that there's a specific schedule or a reason why something, or no reason why something's going to be done. As needed connotes that it's a sporadic thing that's done, and if something is not wrong with the machine... Is there anything in the record to indicate it was a scheduled event, or that it was... There is nothing in the record that indicates... It was only done when it wasn't working, or when it was about to not work? You're correct, Your Honor. There's nothing in the record suggesting that this was done as a matter of routine. But there's no suggestion that it was just done for the heck of it, right? I mean, there had to be some reason why they did it. Either it was about to break down, or it had broken down, or something, right? Correct.  And that... Didn't they specifically say that there were some kind of... I don't remember what the exact words, but they said that the take-up roller was melted, or is there a buildup of lead chips on it that is causing it to not operate as it's supposed to? It seems somewhat different than just your ordinary maintenance, or wear and tear. I don't know. And I would agree with you, Your Honor. Does the record show whether Exide had employees who were regular employees who did the same work? The record does show that Exide had its own preventative maintenance employees, and that they had been bulking up their preventative maintenance employees in the months leading up to this injury. The record does not show that Exide employees were doing this specific task, which is why it was outsourced to Concorp. But it does show, my understanding is, that after they no longer employed an outside business to do it, or outside corporation to do it, they did have their own employees do what happened on this particular day, right? I mean, they changed the conveyor. After Concorp had done it a few more times, they then changed to their own employees doing that. But that only speaks to the fourth element of the routine and frequent tests that the court must apply. Did they change whether the same system was in place? Because I thought they changed the conveyor system. Or did I just misread that? They did, at one point, change the entire conveyor system. That's not the work that's at issue today. Right. And so that's happened. But when you're answering Judge Strauss's question, was this maintenance being done before they changed the whole system? That's my understanding, Your Honor. And who was it being done by? It was being done by Concorp. The fact of the matter is... And after this injury? After this injury, yes. But the plain language of the statute requires this particular activity to be within the usual course of Exide's business, and that's just not the case in this matter. But it doesn't require it to be, I mean, I go back to the hospital case. It doesn't require it to be periodic on a schedule, like every month or anything. Because I presume that the height dividers, or whatever they were called at the hospital in the parking garage, they weren't doing that every week. I mean, you do that once or twice or three times, and then hopefully it don't fall down and cause a problem. It just requires that this is the type of thing that they would normally do. So you don't actually necessarily have to have them change the conveyor belt, but it needs to be the type of thing that their own employees would do, and the type of thing that Concord would do on a regular basis on premises. And I guess I don't understand why that isn't met under that hospital case. Well, Your Honor, I would point the court to Brooks v. Lowry, which is 660 Southwest 3rd 394, and I quote, 287.040 makes clear that it is the work being done at the time and location of the injury, which must be within the usual business of the purported statutory employer. So the Ohlendorf case is the one I believe that you're referring to. That case, there's an agreement between the parties for that specific type of work to be done. It doesn't say the height restrictor plate on the garage is to be changed by the plaintiff's employer, but it generally covered that sort of maintenance. We don't have that here. We have nothing suggesting that Concord was required to continually show up to Exide's facility, and there's nothing in the record that suggests that Concord couldn't just deny Exide's request to show up. But they were. That's the problem I'm having with your argument. You just said they were showing up on a regular basis, and then once the injury happened, they scaled that back. And so I guess my problem is it was happening on a regular basis. Now maybe you argue it's not because of a contract, but I don't know that you've shown that there's a genuine issue of material fact on the usual course of business, because they were showing up on a regular basis. And again, I think that goes back to the type of work that was being done at the time. The changing of the chip conveyor belt. And that's not within Exide's usual business. Exide's in the business of producing positive lead grids, which is an internal battery component. They're not in the business of maintaining machines based on this. But they need the machines to be able to create the product that you're talking about, don't they? You're correct, Your Honor. And I believe that you're now conflating the essential and integral test versus the routine and frequent test that was set forth in the Bass case. So while the maintenance of the machines and the machines working properly, it's essential to Exide producing revenue and producing these positive lead grids. That's not the test that the court's supposed to apply. It's the routine and frequent test, which says if this isn't happening or contemplated to be happening over a short span of time, then this is not a part of the reason. But that's a framing question. And that, I think, your argument is in tension with Ohlendorf, because you can frame it broadly. Do you have to fix, or excuse me, narrowly, do you have to fix this particular machine? Or you can frame it broadly, as in when the machines break down, which they often do in a manufacturing plant, who fixes them and how often does it happen? And it sounds to me like, from the record, it's undisputed that machines that go into making those chips break down pretty often. And who does it? It's Concorp. And your Honor, I see that I'm in my rebuttal time, but I'll briefly address that. It's not always Concorp that does the routine maintenance, as Exide puts it. Chad McGill, Exide's ex-plant manager, has testified that they had their own preventative maintenance employees to address the smaller day-to-day maintenance and preventative maintenance of the machines. This wasn't one of those tasks that they were given. This was something over and above the general routine preventative maintenance of a machine. And that's why it was outsourced to Concorp. Does it matter that Concorp has alleged that they had never changed that conveyor belt before the date of this incident? I don't know. I guess I don't understand that. Isn't that what they said, is that on the incident on February 26, 2018, that was the first time that your guys had gone out there and changed that? And there was some evidence that had been changed by some people from Exide before that? I believe that's after this incident. Concorp... What's the date of this incident? That could very well be my confusion. It is February 26th of 2018. Yeah, and that's what I thought that, you know, and my notes may be inaccurate because I'm capable of doing that from time to time. But I thought that there was some conflicting testimony about who had changed that belt and when they had changed it, but it was Concorp's position that you folks hadn't changed that thing before that date. I believe Chris Vetter, the president of Concorp, had said that they had changed it one or two times. He didn't necessarily give a date on that. I believe the testimony you're referring to is Mr. Nathan Wagon-Knecht, who said that he had changed it before and he's an Exide employee. Nonetheless, that speaks to the usual business. They wouldn't have to hire anyone to change this belt. They outsourced that and it wasn't happening on a routine and frequent schedule, as Exide is alleged. And I will save the rest of my time for rebuttal. Thank you. Ms. Lussico. Thank you, Your Honor. May it please the Court. Just to jump right into that last question, I believe that Mr. Johnson himself had never changed the belt before, but that Concorp had. Not directly through Mr. Johnson or the woman who had been working with him, but Concorp had changed the belt in the past at least once. And it is also true that the Exide... Did Exide change that belt too? Exide, I'm not sure if they changed it in the normal course of it needing to be changed, but their maintenance manager did testify that he had changed it. I'm not sure at which point, but he had changed it, which shows clearly that this isn't specialized work that only a union millwright could do. This was just general maintenance work, which was part of the work that Concorp was doing for Exide as part of this agreement. Now, I don't disagree with you, Judge Erickson, that an oral implied contract is a little bit perhaps of a misnomer, but I think it's exactly as you all have alluded to here, which is, there was an oral contract here for Concorp to come to Exide and perform this maintenance after installing all of this equipment. There was both general maintenance and some other fabrication, some other things that were going on here throughout that time. But there absolutely was this general and preventive maintenance that was occurring at different periods, depending on the type of maintenance that needed to be done. Were they fixing, was Concorp fixing all kinds of machines or only the machines that they had installed? I believe they installed everything at the plant. I believe the evidence shows that Exide had purchased all of this from this Eagle company, and then as soon as they got it from the Eagle company, Concorp came in, they installed it, they rigged it, and then they continued on without a new formal agreement. There was never again a written contract, but the expectation was that at least one person from Concorp was on site at Exide pretty much every day during that time period, and other workers were there at least a couple times a week performing this additional work, including things like belt changes and other maintenance throughout the plant. How long had this been going on between the two parties? I believe the evidence shows that everything was fully installed by perhaps early 2017, so perhaps maybe 8 to 10 months in total. So not a short time. So is that 8 to 10 months long enough that it takes? If you think about how life works, you hire some outside guys to come in and they're going to install a system, they're going to troubleshoot the system, they're going to make sure it's up and running, they're going to get all the bugs out of it, and then eventually it's handed over to whoever is operating the plant. Is 8 to 10 months long enough so you're moved out into the world of where we're doing more ordinary maintenance than we are just like shakedown? Well, they called it ordinary maintenance throughout the testimony, and also this belt had been changed at least once before. So it's not like, hey, here, we'll show you how to change it the first time and then you're on your own from there. They continued to come, they continued to perform whatever needed to be done. Some of that may have been a little bit more involved, but a lot of it was just this routine maintenance that needed to occur. Concorp was there, so it makes sense that Exide would just have them continue to do these items that Concorp had employees to perform. Was there any rhyme and reason on how the maintenance duties were allocated in the sense that how did they, what does the evidence show in terms of how they divided between Exide employees and Concorp folks? I'm not sure there's a specific delineation there. There was, there's not a lot of evidence about specifically what the Exide employees were doing, the maintenance employees, but the Exide maintenance manager, Mr., the W name that I'm going to butcher if I try to say it, he was ahead of everybody. He was the one telling everybody what they needed to do. He's the one who assigned Mr. Johnson on the day he replaced the belt, assigned that task to him and indicated that they wanted it done a specific way. So they were in charge here. This isn't a situation where you've got a licensed electrician coming in and you're saying, I don't know what's wrong with my lights. Can you please just fix them? Exide was taking the lead on this. Mr., the maintenance manager had changed the belt at some point, so he knew he could do it. He knew how he wanted it to be done and he directed Concorp's employees on how to do that work. So this is more of a routine maintenance, something that probably the employees, the general maintenance employees could have learned to do. This isn't exactly specialized work. I think the maintenance manager explained that you take a pin out, first you lock out the machine, you take a pin out, you insert the new belt, you pull it through, you put the pin back in. It doesn't sound especially complicated. Why is this so factually clear that no trial is needed, that this could be resolved on summary judgment? Why wouldn't these questions about control and the normalcy or frequency of the work being done, why shouldn't those be facts resolved through testimony? Because to the extent there are any disagreements on these facts, none of them are material. There's no dispute that these Concorp employees were performing this work. There's no dispute that this belt had been previously changed. There's no dispute that the maintenance manager instructed Concorp, ultimately Mr. Johnson, to perform this specific task. So if there is any dispute of fact, it's... So is it disputed whether the defendant would have done this with or without Concorp being present? I think that goes to the question of, the more question of law, of whether this was in the ordinary course of the business, which you can take all the facts that are undisputed and make that determination. It is ultimately not a dispute of fact, it's just that this test is a little bit of a fact specific test and the courts have, I think, struggled with that. The Missouri courts have struggled with that and gone a little bit back and forth. But we have clear case law from Missouri that shows that even something as needed as changing light bulbs at a Walmart can cause you to be a statutory employer because it's not, I believe the court used the specific word, episodic. It's not episodic, it's still a routine thing. Light bulbs are going to burn out. They might not burn out exactly on a schedule. It might not be every 60 days 10 light bulbs are going to burn out, but over the course of a period of time, a number of light bulbs are going to burn out. And that's exactly what we have here. There's no fact dispute that this belt needed changed. There's no fact dispute that other maintenance items were being handled by Concorp as they were there majority of the week. There was a big list of things for them to do. Things were orally added as needed, as those maintenance terms, as those maintenance items became. Is that what's called the dynamic list? The dynamic list was a list of things that Exide wanted Concorp to do, but it's clear from the uncontroverted facts that Concorp also did other things. I don't think we can really dispute that there was an agreement here because even if Concorp could have said, okay, we're done, we're not doing any more, they didn't do that. They continued to come every day. They did perform the routine maintenance. They didn't say, well, look, this is below our union mill rights skill level, so we're not going to do it. You can have your own people do it. They continue to do the maintenance. Even things like changing belts that are things that other maintenance people could have done. This isn't a situation where, like if it was an engineer, where there's a requirement that you have a licensed engineer sign off on something. This was a simple belt change that could have been done by in-house maintenance, could have been done by anyone they'd hired at the time they decided to hire it out. Does it matter that Missouri law has changed from preferring statutory employee status to just kind of leaving it not with a tilt towards including contract employees under the employers? So I believe- Workers' Comp. I'm sorry, your honor. I believe you're maybe referencing the strict construction language in 2011. Think about it. Workers' Comp, remedial act, we interpret them broadly to provide remedy. In most states in our circuit, this would not be a particularly close question because they would say you read the act as broadly as possible to provide workers' compensation coverage as broadly as possible so that the workers don't have to show fault in order to recover, right? But Missouri has at some point said that it's no longer a remedial act and it should be strictly construed. Yes, your honor. That's true. In 2011, the Missouri courts kind of tailed back on some of the broad pronouncements of the Workers' Comp. statute. However, those cases that have been decided post-2011 after that pronouncement, it's not this narrow, like, oh, only in these specific circumstances can there be a statutory employer because the purpose is still true. The purpose is to catch all of those employees who would be employees if they weren't contractors because we don't want to incentivize businesses to just hire a bunch of contractors. That way they don't have to pay unemployment compensation or workers' compensation. And so this maintenance work still falls squarely within that workers' compensation statute. But the difference, of course, is that ordinarily, you know, all these Workers' Comp. Act came about starting in about 1912 and they came forward and the whole idea is we're going to provide sure and certain relief to employees, right? And what Missouri is saying is that, well, you know, this particular Workers' Comp. bar protects somebody from being bound by their Workers' Comp. and excuses someone for their negligence and we're going to now look at this no longer as a remedial act and instead that it should be strictly construed to its limit. I don't think that the court has gone that far. I think they have announced that the Workers' Comp. statute should be strictly construed but the cases specifically discussing the statutory employer framework haven't deviated from those previous cases where they still find contracts can be these broad, oral, written, express or implied. They haven't tailored that down since the pronouncement. To what end, then, was this announcement made? I believe it was outside of the specific statutory employer context. I believe, and I didn't look closely at this because honestly it just occurred to me this morning as I was sitting in court, but I believe Missouri legislature, because it's a part of the statute, it's not a court-driven. I believe they perceived that the Workers' Comp. statute was allowing benefits too broadly to people who were injured and our Second Injury Fund was in very bad shape and therefore the legislature decided to rein in a little bit of some of these claims that maybe with a broad reading of the statute would have been covered but with a more strict reading of the statute are no longer covered by Workers' Comp. I don't think it was an intent to allow, I don't think anyone really thought of this portion of the statute. In fact, I think the legislature has also broadened with the co-employee liability that used to not be allowed in Missouri. They're not really limiting the statute down to, oh well, it has to be an everyday employee, it has to be exactly what you're doing. That's not where the case law has been going. I wanted to ask you about that. You were making that point earlier. This is really asking, is somebody like an employee? I think that's what everything gets down to. Is this somebody like an employee? Are there differences between the way Exide was treating its own employees as regards to maintenance versus the way Comcorp employees were treated? In other words, when those two categories of folks came into Exide, were they treated the exact same way as far as maintenance was concerned? I believe based on the record, which is not very clear based on the normal Exide employees, it seems that they were because Exide was directing this maintenance. They were the ones who were saying, okay, we need people to do this today, we need you to do this today. It wasn't Comcorp coming in and saying, okay, hey, we're the millwrights here, we're going to do these things that need to be done maintenance-wise. It was still Exide that was leading the charge here. They were the ones in charge of all of this maintenance, and they were telling Comcorp what to do and how to do it. I believe that the Comcorp employees, at least in this context, in this maintenance context, were being treated like employees and were employees, and therefore the workers' comp statute should control. Thank you very much for your time. Thank you, Mr. Lussico. Counsel, I'm going to ask you right off the bat, because this is really important. In your view, how does the evidence show that they were different? You just heard opposing counsel say they were basically treated the same. They were in the same pool, and you go fix this machine, you go fix that machine, and the guy in charge was the Exide maintenance manager. Can you tell me how they were different, how they were treated differently from Exide employees? Yeah, absolutely. Exide had a specific list of tasks that they wanted Comcorp to do that they didn't want their own employees doing. They had their own preventative maintenance employees. They said these tasks are in Comcorp's realm. They're not in our employees' realm. As for Exide controlling Comcorp employees, that's just not what the record shows. Exide said this is the maintenance that needs to be done, and that was the end of their involvement. I thought the record here was that there was actually an Exide supervisor who directed the plaintiff here to do this task. He directed the lead, John Boone, of Comcorp, who was on site that day, that the task needed to be done, and then John Boone then assigned it to Mr. Johnson. While Exide said, yes, this task needs to be done, and we need you guys to complete it, Exide wasn't saying, I need you to stand here, take this pin out like this. That was not their involvement at all. So I believe that that- You're drawing a distinction between Exide says, replace that belt, or somebody who's doing minute direction, like an immediate supervisor who stands over a technician while he's doing the work. Is it not just sufficient just to say, remove the belt? I think the discrepancy is Exide had to tell Comcorp what the issue was, or that the belt needed replacement at all. Comcorp couldn't just walk into the facility that day and say, okay, let me walk around these machines, see what needs to be done. This is something that had been observed by Exide employees that they then had to communicate to Comcorp. Isn't that true of Exide employees? Exide employees couldn't just go in and fix a machine unless they got supervisor approval. They'd have to tell somebody, in which case they'd be saying, okay, now go fix that machine. They'd have to tell the supervisor that the machine needed maintenance. But again, this case is different because the specific maintenance was set aside for Comcorp weeks in advance. It wasn't something that Exide was doing on a daily basis with their own preventative maintenance employees. Can I ask a follow-up question? Sure. So this is, the question I really have is, didn't it happen on the day of? I thought this was one where somebody said, hey, they've got the conveyor belt, it's not working. I thought somebody noticed it that day and went to Comcorp. So this wasn't weeks in advance? No. The list that brought Comcorp employees to the Exide facility was weeks in advance. And I think that's established through the record. I think it was sent on February 12th. So weeks in advance, they had planned to have Comcorp do specific tasks at the facility. And this one, the changing of the conveyor belt arose on the fly as it was put in the deposition. So is it possible you could be a statutory employer for some of Comcorp's work and not a statutory employer for some other of their work? I think that's a very complex question that is factually based. So this particular work, the changing of the conveyor belt, obviously would not be within a statutory employee relationship because it wasn't done repeatedly over a relatively short period of time. Whereas if Comcorp was on site every single day, which is also disputed, they were on site maybe once or twice a week at the time that this incident happened. And they were doing just general maintenance alongside of the Exide employees. Then that's a whole other factual situation in which a statutory employer relationship might be found. I should have my time. When I read the briefs and I studied this case, I kept coming back to this point. Nobody really seems to think it's important. I just want to make sure you don't think it's important. And that is that I kept coming back to Comcorp was hired to install a series of machinery. And that machinery was installed. And it was recently installed, in a sense, less than a year. And Comcorp had been completely on the scene, doing work on it, which I thought was like what you did, which looked to me like the kind of, when you shake down a line, you work on it and you work on it until it's running the way it's supposed to. And then at some point, it becomes ordinary maintenance. And to me, wherever that line is in there, it makes a difference. But it doesn't seem like it does to either of you two. You know what I'm saying? I mean, to me it seems like if I'm installed to, if I'm hired to install a boiler system and I install a boiler system and I'm doing callbacks because the boiler needs tweaking and it needs tweaking and the pumps need to be changed and I'm doing this and that, as long as I'm just still trying to get the installation right, then I'm just working for myself. But on the other hand, if it turns to the point where I'm just now showing up to do routine replacement of filters and checking the pipe fittings to make sure that everything's right, now all of a sudden I'm just doing routine, ordinary maintenance. And it seems to me that that was a distinction that was present in this case. But as I've heard the argument, and I know that I'm inarticulate, so I maybe never got it asked right, but it seems to me that what I'm hearing here is that that's not a focal point in this case. I would agree, Your Honor. That's not a focal point in this case because this maintenance could have been done by any other independent contractor. They didn't have to bring Concord back to do this. And it could have been done by an Exide employee and you were there and Mr. Boone and Mr. W. just said, hey, since you're here, replace that belt, by the way. And doesn't that look like just ordinary maintenance then? It's done routinely and regularly? I would disagree with that because this routine and frequent schedule is now being conflated with whether the machine needed essential work to be done at any point. So the fact that this happened potentially two times over an eight to ten month period means that months and months had gone by before this needed to be done again. Well, a belt might be like a filter that just sits there and goes for months before it needs to be replaced, right? I mean, really? Is there some reason to believe that a conveyor belt into a lead melting smelter is something that needs to be replaced like every two weeks or something? There's no reason to believe that it needs to be, which is why it's not a routine activity of Exide. Ultimately, we just don't believe that this meets the usual business of Exide in producing positive lead grids for batteries because it's not done on a consistent routine basis. Thank you, Your Honor. I see my time's up. Thank you, counsel. The court appreciates both attorneys' participation and argument before the court this morning. We'll continue to study your briefing, render decision in due course. Thank you. Madam Clerk, I believe that concludes our scheduled arguments for the morning. It does, Your Honor. That being the case, court will be in recess until tomorrow morning at 9 a.m.